UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LEVI OLIVER MCADOO, ) | CASE NO. 1:12CV2101 |
| Plaintiff, ) | JUDGE LESLEY WELLS |
| v. ) | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN[1], ) ACTING COMMISSIONER OF ) SOCIAL SECURITY, ) | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. ) | |

Levi Oliver McAdoo ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

I.    **PROCEDURAL AND FACTUAL HISTORY**

On September 29, 2008, Plaintiff applied for SSI alleging disability beginning on May 1, 1997, when Plaintiff was eight years of age. ECF Dkt. #11 ("Tr.") at 115.[2] The SSA denied Plaintiff's application initially and on reconsideration.[3] Tr. at 62-63. Plaintiff requested an administrative hearing, and on February 23, 2011, an ALJ conducted an administrative hearing and

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

[3]Plaintiff filed a previous unsuccessful SSI claim in 2007, which was not appealed. Tr. at 59-61.

accepted the testimony of Plaintiff, who was represented by counsel, and Nancy Borgeson, an impartial vocational expert ("VE"). Tr. at 33-58. On April 12, 2011, the ALJ issued a Decision denying benefits. Tr. at 17-26. Plaintiff filed a request for review, which was denied by the Appeals Council on June 20, 2012. Tr. at 1-4.

On August 15, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On February 4, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #13. On March 21, 2013, Defendant filed a brief on the merits. ECF Dkt. #14. No reply brief was filed.

**II**.　　**SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was twenty-two years old on the date of the hearing, suffered from organic mental disorders (Chronic Brain Syndrome), affective disorders (Bipolar Disorder Type I), and attention deficit hyperactivity disorder (ADHD), which qualified as severe impairments under 20 C.F.R. §416.920(c). Tr. at 19. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 19.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: Plaintiff is able to perform simple and routine tasks in a routine, static, predictable work setting that does not require strict production quotas or fast-paced performance, and requires no more than superficial contact with others. Any changes must be adequately explained. Plaintiff cannot perform any work that requires reading or math skills for self instruction or task performance. Plaintiff is able to interact in situations that do not require resolving conflict or persuading others to follow demands. *Id.* at 21.

The ALJ ultimately concluded that, although Plaintiff had no past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including that of hand packager, laundry worker, and industrial cleaner. Tr. at 24-25. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## V.    ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ did not give controlling weight to the opinion of his treating physician. Second, Plaintiff contends that the ALJ did not evaluate pertinent evidence.

### A.    Medical history

Plaintiff attended the Positive Education Program ("PEP") at the Midtown Center for Youth in Transition, as an alternative to public school, from 1998 through June 2007. Tr. at 297-314, 316, 353-74, 375-473, 572-94. On September 19, 2007, William Myer, CPST[4] at Midtown, completed a daily activities questionnaire. Tr. at 465-66. Mr. Myer opined that Plaintiff's impulsiveness, poor judgment, and poor social skills prevented him from living independently and that, although he got along well at times, his mood changed suddenly. Tr. at 465. He noted that Plaintiff could prepare simple meals; complete chores, although not always consistently; struggled with shopping; did not drive; could not bank or pay bills; and that he received assistance from his mother with his daily activities. Tr. at 466. Mr. Myer wrote that Plaintiff had worked sporadically at odd jobs and that he had never been fired or disciplined in an employment setting. Tr. at 465. Regarding Plaintiff's ability

---

[4]"CPST" appears to stand for "Community Psychiatric Supportive Treatment."

to complete a normal workday or workweek, Mr. Myer opined that Plaintiff would struggle with issues of impulsiveness, poor stress tolerance, and his ability to maintain focus. Tr. at 465.

On November 11, 2008, M. Breen, a licensed social worker at Midtown, completed a questionnaire regarding Plaintiff's behavioral problems. Tr. at 298-99. Ms. Breen explained that Plaintiff began attending the PEP program in March 1998 due to disruptive behaviors at his traditional high school. Tr. at 298. She stated that while attending Midtown, Plaintiff received social-emotional skills training, but was uncooperative with this training and required intensive support from the staff . Tr. at 299. Ms. Breen further stated that Plaintiff refused to comply with the program and treatment goals. Tr. at 299.

From July 30, 2007 through August 10, 2007, following his graduation from Midtown, Plaintiff participated in a work evaluation assessment program at BVR/Vocational Guidance Services. Tr. at 355-63. Plaintiff stated that his work history included maintenance at a veterinary hospital from 2005 until 2007 and that he left this job after someone made a racial slur. Tr. at 355. He also stated that he worked at a Speedway concession stand every Sunday from 2004 through the time of the assessment. Tr. at 355.

At the conclusion of Plaintiff's evaluation period, his performance was summarized as follows: While Plaintiff produced an overall work speed of 43.75% during the Valpar Component Work Samples, placing him below the competitive level of employment, he had an overall work accuracy score of 113.75% placing his accuracy performance in the high competitive level of employment. Tr. at 358.

Plaintiff participated in a situational assessment in building maintenance and the instructor observed that Plaintiff:

- was in attendance every day, with the exception of one day with notice of absence
- used the bus system for transportation and arrived early
- usually had good manners and behavior during work, meals, and breaks
- maintained good appearance for a job setting
- followed and respected all rules

-5-

> - got along with others
> - looked for things to do
> - was willing to assist anyone that needed help
> - asked questions and responded to directions easily
> - sought help most of the time when he was unsure
> - demonstrated work quality that meet the requirements for work
> - was not completely independent and needed occasional checking
> - had good attendance and punctuality
> - demonstrated job ready behaviors in the aspect of getting along with co-workers, attendance, and punctuality

(Tr. 359).

While taking part in the work evaluation, Plaintiff was mostly cooperative but had to be reminded to stay on task, he socialized appropriately although he was excessive in some cases, and he displayed good attendance and punctuality. Tr. at 360. Plaintiff had an "adequate" ability in most learning aptitudes, work behaviors, and personal characteristics and only needed "some improvement" in the areas of general learning ability, ability to attend to detail, ability to work independently, ability to attend to task, ability to sustain concentration, and maintain frustration tolerance. Tr. at 360-61.

Notably, Plaintiff did not have any areas where he needed "much improvement" or displayed "unacceptable" performance. Tr. at 360-61. Regarding barriers to employment, Plaintiff had a limited attention span and needed to be reminded to stay on task, had
a limited skill set, and had below average reading comprehension and math skills. Tr. at 362.

Herschel Pickholtz, Ph.D., performed a psychological examination of Plaintiff on November 5, 2007. Tr. at 268-73. Plaintiff told Dr. Pickholtz that he had never worked as an adult, but that he had worked as a juvenile for about a year working about twelve hours per week. Tr. at 468. Plaintiff stated that he was doing "fairly O.K." as the result of his medications prescribed for ADHD. Tr. at 468. He explained that while he had been seeing a psychologist since he was ten years old, he had never received much counseling and only received medication monitoring. Tr. at 468.

Plaintiff told Dr. Pickholtz that he received "C"s and "D"s in school, except that he was "fairly good" in mathematics. Tr. at 468. He further stated that he was arrested once for assault after he swung his fist at a teacher that went into his pockets without his permission. Tr. at 369.

Plaintiff stated that he had been dating a girl for about one year and that their relationship was very good. Tr. at 469. He also reported having a good relationship with his mother and stepfather. Tr. at 469. Plaintiff explained that he had been training as an automobile detailer for six weeks and that this was going good. Tr. at 469. After arriving home from training, he would perform some chores including vacuuming everyday and sweeping and mopping the floors two times per week. Tr. at 469. Plaintiff said that he could cook simple foods, used the internet, liked to read the comics, and also liked listening to music videos. Tr. at 469.

As for hobbies, Plaintiff stated that he liked to work on cars and that he saw his friends once or twice per week to go bowling. Tr. at 469. He also said that he saw his girlfriend two times per week and that they would go to the movies and restaurants Tr. at 469. Plaintiff also stated that he went fishing on Sundays when he was not working. Tr. at 469.

On examination, Dr. Pickholtz reported that Plaintiff was dressed neatly and appropriately. Tr. at 469. When asked what was stopping him from working, Plaintiff stated that he thought he could work. Tr. at 469. Plaintiff's verbalizations fell within the borderline level, his affect was within the average range, and his mood was appropriate. Tr. at 470. Plaintiff denied suicidal or homicidal ideation, showed no signs of anxiety, and displayed no signs of mood swings. Tr. at 470.

Dr. Pickholtz diagnosed mild to moderate ADHD, moderate reading disorder, borderline intellectual functioning, and found Plaintiff to have a Global Assessment of Functioning ("GAF") score of fifty-five to sixty.[5] Tr. at 472. He concluded that overall Plaintiff had a mild impairment of his ability to relate to co-workers, a mild to moderate impairment of his ability to handle the thinking and memory necessary to work an eight-hour day, and a mild to moderate impairment in

---

[5] A GAF score is the clinician's judgment of the individual's overall level of functioning. A GAF score of fifty-one to sixty indicates moderate symptoms or moderate limitations of functioning. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) 32, 34 (4th ed. 2000).

his abilities to handle the stresses and pressure of low skilled work. Tr. at 473.

Elizabeth Hill, M.D., a psychiatrist, treated Plaintiff from May 1997 until December 2009. Tr. at 598-603, 644, 654-661. In a questionnaire completed on January 27, 2008, Dr. Hill opined that Plaintiff's clinical mental status abnormalities included an irritable affect that easily escalated to rage, grandiosity, and rapid and excessive talking. Tr. at 497. She noted that Plaintiff left his BVR training program due to anger, that he had problems staying on task, and that he had a low frustration tolerance. Tr. at 497. She further opined that Plaintiff was unable to work. Tr. at 497. Dr. Hill stated that Plaintiff angered easily, had a low frustration tolerance, and that he was affected by stress. Tr. at 497. She stated that Plaintiff's medications had helped him improve, but had not made his conditions go into remission. Tr. at 498. She concluded that Plaintiff was not able to tolerate stress. Tr. at 498.

Dr. Hill completed a daily activities questionnaire on October 9, 2008. Tr.at 597-98. Dr. Hill opined that Plaintiff's ability to manage his finances and maintain adequate nutrition prevented him from living independently. Tr. at 597. She wrote that Plaintiff did not visit with friends often due to intermittent conflict which at times had become aggressive. Tr. at 597. Dr. Hill stated that Plaintiff had left his work training program due to anger problems and had needed to attend anger management before returning to the program. Tr. at 597. She further stated that his legal difficulties consisted of assaulting a teacher. Tr. at 597.

Regarding his ability to care for his own needs, she opined that Plaintiff had a poor ability to prepare food, only intermittently performed household chores, could not shop independently, could take a bus, and had never paid bills. Tr. at 598. She concluded that Plaintiff was compliant with keeping his appointments and taking his medications. Tr. at 598.

On this same date, Dr. Hill also completed a mental status questionnaire noting that Plaintiff had a euthymic affect and a good mood and was only intermittently irritable. Tr. at 599. Plaintiff had some problems with concentration, short-term memory, abstract reasoning, and fund of knowledge. Tr. at 599. He also had fair to poor insight and judgment. Tr. at 599. Dr. Hill stated that Plaintiff could understand uncomplicated directions, had a fair attention span, and that his persistence depended on his mood. Tr. at 600. She stated that Plaintiff had a poor ability to interact with peers

and adults, a poor ability to adapt to change, and that work pressure would likely exacerbate his mood disorder. Tr. at 600.

Dr. Hill's treatment notes reflect that in February 2009, Plaintiff reported that he had gotten a job performing maintenance work for a lawyer but had been laid off. Tr. at 648. She noted that Plaintiff was sometimes loud and verbally abusive. Tr. at 648. Nonetheless, on examination, Plaintiff had a euthymic affect, no suicidal or homicidal ideation, fair to poor insight and judgment, and fair attention. Tr. at 648.

In May 2009, Dr. Hill noted that Plaintiff was currently living in a shelter and looking for a job. Tr. at 655. She observed that Plaintiff had a labile affect, occasional rapid speech, limited insight and judgment, fair attention, and no suicidal or homicidal ideation. Tr. at 655. Dr. Hill noted that Plaintiff's bipolar disorder and ADHD were stable with some persistent symptoms and that he should continue his current medications. Tr. at 656.

Dr. Hill examined Plaintiff in August 2009, at which time Plaintiff reported his mood as being "fine". Tr. at 657. Plaintiff's affect was initially calm, but then became irritable/angry, and displayed rapid speech, fair to poor attention, and limited insight and judgment. Tr. at 657. In October 2009, Plaintiff had a constricted affect, poor attention, and limited insight. Tr. at 659. However, his thoughts were organized and his mood was calm. Tr. at 659. In December 2009, Plaintiff reported doing O.K. and that he was performing community service. Tr. at 660. On examination, Plaintiff appeared mildly irritable, had loud speech, and had limited insight. Tr. at 660. However, his thoughts were organized and he maintained good eye contact. Tr. at 660.

On March 30, 2008, Plaintiff underwent mental health treatment at Huron Hospital after arguing with his mother and becoming extremely hostile and angry. Tr. at 504. On August 20, 2010, Plaintiff underwent a psychiatric examination at MetroHealth System by Kristina Stefanac, M.D. Tr. at 664-67. Dr. Stefanac noted that Plaintiff's current psychiatric medications included Zyprexa and Geodon and that Plaintiff admitted that these medications were helpful. Tr. at 665. On examination, Plaintiff appeared calm and cooperative. Tr. at 666. He had a euthymic mood and mood-congruent affect. Tr. at 666. He had appropriate and spontaneous speech, a logical and organized thought process, no hallucinations, and he denied suicidal and homicidal thoughts. Tr. at

666. Plaintiff had sustained memory and attention and fair insight and judgment. Tr. at 666. Dr. Stefanac diagnosed bipolar disorder and ADHD and assessed Plaintiff's GAF score as sixty-one through seventy, indicating only mild symptoms with only mild difficulty functioning. Tr. at 666.

### B. State agency physical assessment

On November 11, 2008, Karen Terry, Ph.D., a state agency psychologist, reviewed the evidence of record and completed a mental residual functional capacity assessment form. Tr. at 626-28. Dr. Terry noted that Plaintiff retained the ability to perform simple, routine tasks in a routine, static, and predictable work-setting that did not require strict production quotas, fast paced performance, and required him to have only superficial contact with others. Tr. at 628. Dr. Terry opined that Plaintiff should not perform jobs that required reading or math skills for self-instruction or task performance. Tr. at 628. Finally, she noted that Plaintiff could interact in situations that did not require resolving conflict or persuading others to follow demands. Tr. at 628. David Demuth, M.D., reached similar conclusions regarding Plaintiff's limitations on November 28, 2007. Tr. at 475-477.

### C. Hearing testimony

At the hearing, Plaintiff testified that he volunteered for seven months as a helper at a kennel, for which he received school credit. Tr. at 39. Plaintiff received his high school diploma, but he graduated from an alternative program "for children who [cannot] make it in normal schools." Tr. at 39-40. Plaintiff quit his job at the kennel because of "issues" he was having with a female coworker. Tr. at 40. Then he testified that a male coworker made an offensive comment and Plaintiff "just had enough and got so angry and the words just came out of [his] mouth and [he] said [he] quit." Tr. at 40. He further testified that, after graduation, he did not have the focus to find a job. Tr. at 40. Plaintiff asserted that he has difficulty reading and spelling and that he has "no focusing skills." Tr. at 41-42.

Plaintiff testified that he is bipolar and has difficulty managing anger. Tr. at 45. According to Plaintiff, he "flips out" and gets aggressive when other people say the "simplest things." Tr. at 41, 43. He gets frustrated and angry when someone says something he does not like. Tr. at 43. Plaintiff testified that he does not have many friends, and that he frequently gets into fist fights with

his best friend from childhood, who is bipolar. Tr. at 44-45. He also "flips out" on his mom, who he identified as the person to whom he is the closest. Tr. at 44. He recounted a verbal altercation at a supermarket, when a store clerk criticized him because he could not read. Tr. at 44. Plaintiff further testified that from ninth grade to graduation, he was with a teacher in a separate room, because he "[could not] take the stress and the words other students would say to [him] and stuff like that." Tr. at 41.

Plaintiff suffers from seizures, which began after he was hit in the head with a shingle that fell from the roof. Tr. at 50. He is prescribed Depakote for seizures, and Zyprexa and Geodon to treat his bipolar disorder. Tr. at 48. When asked to identify the conditions that prevent him from working, Plaintiff explained that he has difficulty focusing and getting along with co-workers. Tr. at 42.

### D. The ALJ's decision

The ALJ gave some weight, rather than controlling weight, to the opinion of Dr. Hill because her opinion was not supported by the evidence of record. Tr. at 22. According to the ALJ, he discounted Dr. Hill's opinion because she did not provide her treatment notes to support her conclusions in the questionnaires. Furthermore, the ALJ found that Dr. Hill's conclusions regarding Plaintiff's alleged inability to work were predicated upon Plaintiff's educational experiences rather than his vocational experiences.

The ALJ gave full weight to the opinion of Dr. Stefanac because it was supported by the evidence of record. The ALJ gave great weight to the opinion of Dr. Pickholtz for the same reason, and also because his opinion was predicated upon his personal examination of Plaintiff. Finally, the ALJ gave great weight to the opinions of the non-examining agency physicians because they were supported by the medical evidence contained within the record.

### E. Treating physician rule and substantial evidence

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion

-11-

of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, __ F.3d __, 2013WL896255, *9 (6th

Cir. March 12, 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

Here, the ALJ correctly concluded that Dr. Hill's conclusions are inconsistent with the evidence in the record and, on occasion, appear to be predicated upon mistakes of fact. For instance, Dr. Hill noted that Plaintiff was forced to quit the BVR training program due to his anger. Tr. at 497. To the contrary, Plaintiff completed the program, demonstrating an adequate ability in most learning aptitudes, work behaviors, and personal characteristics. Dr. Hill noted that Plaintiff had difficulty maintaining relationships, however, Plaintiff reported a year-long positive relationship with a girlfriend. Tr. at 469. Dr. Hill concluded that Plaintiff did not have the ability to prepare food or perform household chores. Just the opposite, Plaintiff told Dr. Pickholtz that he vacuumed, mopped the floor, prepared simple meals, and used the internet. Tr. at 469.

The ALJ also wrote that Dr. Hill provided no support for her conclusions with any of her physicians' notes in the record. Dr. Hill's patient notes from 2009 were included in the record and established that Plaintiff struggled with frustration and anger, but that his anger and frustration improved with medication. Dr. Hill saw Plaintiff approximately once every two months from April 5, 2010 to February 8, 2010. Tr. at 655-661. Dr. Hill's notes from May 15, 2010 indicate that Plaintiff's bipolar disorder and ADHD were stable. Dr. Hill's 2009 notes establish that Plaintiff benefitted from the use of Concerta. She consistently reported that Plaintiff's thoughts were organized, despite the fact that he was loud and agitated. It is important to note that Plaintiff acknowledged that he had never received much counseling from Dr. Hill, and that her primary function was the monitoring of his medication. Tr. at 468.

The ALJ nonetheless credited Dr. Hill's opinion to the extent that he limited Plaintiff to simple, routine tasks in a routine, static, and predictable work setting, work that does not require strict production quotas or fast-paced performance, and work that does not involve more than superficial contact with others. The evidence in the record established that Plaintiff has worked

successfully in the field of maintenance, both at the kennel and the lawyer's office. Accordingly, the ALJ did not err in giving less than controlling weight to the opinion of Dr. Hill.

Next, Plaintiff contends that the ALJ did not give the appropriate consideration to the BVR report or the daily activities questionnaire completed by Mr. Myer. The BVR report and the daily activities questionnaire indicated that Plaintiff had problems with both concentration and anger management. As previously stated, the ALJ recognized that Plaintiff had the residual functional capacity to perform simple tasks without production quotas or fast-paced performance, and provided only superficial contact with others. The lion's share of the evidence in the record establishes that Plaintiff is capable of performing work within the parameters of the RFC fashioned by the ALJ. The opinions of examining physicians, as well as non-examining agency physicians, is consistent with Plaintiff's work experience in the record. Accordingly, the ALJ did not ignore pertinent evidence when he concluded that Plaintiff is not disabled.

## VI.     CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint with prejudice.


DATE: August 20, 2013

                                               */s/George J. Limbert*
                                               GEORGE J. LIMBERT
                                               UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).